522 P.2d 802

**PUBLIC SERVICE COMPANY of New Mexico, Petitioner-Appellant,**

v.

**NEW MEXICO PUBLIC SERVICE COMMISSION et al., Respondents-Appellees.**

**No. 9846.**

Supreme Court of New Mexico.

May 24, 1974.

Keleher & McLeod, William B. Keleher, Albuquerque, for petitioner-appellant.

David L. Norvell, Atty. Gen., James L. Parmelee, Jr., Agency Asst. Atty. Gen., Santa Fe, for New Mexico Public Service Commission.

Dennis R. Francish, Albuquerque, for Continental Divide Electric Coop.

Bigbee, Byrd, Carpenter & Crout, Richard N. Carpenter, Santa Fe, for Plains Electric.

## OPINION

MONTOYA, Justice.

This case was tried before the New Mexico Public Service Commission (Commission) on a complaint made by Continental Divide Electric Cooperative, Inc. (CD), alleging that Public Service Company of New Mexico (PNM) proposed to extend its system and construct lines to provide electric service to Ranchers Exploration and Development Corporation (Ranchers) in territory served by CD. The complaint sought to enjoin PNM from providing such service, alleging in various counts that PNM had no certificate of public convenience and necessity (certificate); that such certificate as PNM had was limited and restricted; and that the proposed PNM extension would unreasonably interfere with CD's system and service. PNM responded to the complaint by filing a motion to dismiss; that its existing certificate authorized such service; and in the alternative that it be granted a certificate to render such service. Plains Electric Generation and Transmission Cooperative, Inc. (Plains) was allowed to intervene and its intervention complaint was in support of CD's position.

After the hearing, the Commission entered its order which denied PNM the right to provide electric service to Ranchers, and granted to CD a certificate to serve the disputed electric load. PNM petitioned the District Court of McKinley County for review of the Commission's order, alleging the order was unreasonable, unlawful and not supported by substantial evidence. The district court, after hearing the matter on the record, entered its judgment affirming the order of the Commission. PNM appeals.

Pertinent findings made by the Commission are summarized as follows. Ranchers proposed to sink a shaft to an approximate depth of 1,350 feet in order to mine uranium. The shaft will be in Sec. 7 and the mine will be within Sec. 7 and the section to the north, Sec. 6, all within McKinley County. Ranchers required three-phase electric service at 13.8 KV and was not receiving electric service from any public utility.

In 1958 and 1959 the Commission had granted certificates to PNM. The Commission's order in case No. 549, issued in 1959, granted to PNM a certificate to service certain identified customers and

" * * * 'other prospective customers who may be economically served from the above described facilities and from [PNM's] existing facilities in McKinley County, New Mexico and to render the said service to the said customers.' "

At the time the orders were issued in cases Nos. 524 and 549, CD was not a public utility under the New Mexico Public Utility Act. The New Mexico Legislature, under Ch. 96, Laws 1967, brought all rural electric cooperatives under the jurisdiction of the Commission.

The Commission found that Ch. 96, Laws 1967, "annulled" in part the certificate issued to PNM in case No. 549, which certificate had permitted PNM to serve all loads which were economically feasible to serve from its then existing facilities; that CD became a public utility by legislative fiat and thus CD was entitled to the protection of § 68-7-1, N.M.S.A., 1953 (Repl. Vol. 10, Pt. 1, 1973 Pocket Supp.), which prohibited PNM from extending service into territory receiving service from CD without a certificate that the public convenience and necessity so required.

The Commission also found that the Ranchers' load was contiguous to both CD and PNM and, therefore, neither could serve without a certificate pursuant to § 68-7-1, supra. The 115 KV line of PNM was north of Sec. 6, and CD's nearest line was to the south of Sec. 7. There were no electric facilities of either utility in either section. CD's existing three-phase distribution line, located to the south of the mineshaft, was capable of providing Ranchers "* * * with all of its construction power requirements[,]" and was 1.1 miles distant from the Ranchers' mineshaft location, which line was a 14.4-24.9 KV three-phase line. PNM's nearest electrical distribution line was a three-phase line located 3.46 miles northwest of the mineshaft, with voltage at 13.8 KV. Although CD's nearest line was 1.1 miles distant from the Ranchers' mineshaft location, the proposed method of service to Ranchers by CD (for permanent service as opposed to construction power) required the installation of a substation in conjunction with Plains, and running therefrom a new express feeder line which would necessitate the construction of approximately six and one-half to seven miles of a trunk feeder express line by CD. CD's proposed cost and expenditures to serve Ranchers at its requested voltage of 13.8 KV would be approximately $297,000. PNM's cost would be approximately $238,000. PNM would have to build less than one mile of line (actually .85 of a mile), since PNM would be connecting to its 115 KV line. Under PNM's proposal, Ranchers would expend $30,000 to construct its own electric distribution lines. The Commission did not make a finding as to what the cost to Ranchers would be in the way of construction if CD were to provide service, but testimony established that Ranchers would have to build a distribution line northward to serve the ventilating fans. Under present rates as filed with the Commission, Ranchers would save up to $20,000 a year if CD were serving rather than PNM. Notwithstanding the savings to Ranchers if CD provided electric power and energy to Ranchers, Ranchers expressed a preference for PNM's proposed service.

The Commission found that CD at the present time is operating facilities which are in need of immediate improvements. The Commission further found that, at some time in the near future, CD will have to improve its system served by its Blue Water Substation and this will require the installation of a 10 MVA stepdown substation. The Commission also found that PNM's proposal to render electric service to Ranchers would result in

"* * * unreasonable interference with the service and system of CD to the injury of CD because it would be deprived of an electric load and revenue derived therefrom, which load developed in territory contiguous to CD's existing system and which load and the revenues derived therefrom are necessary and required to enable CD to feasibly improve its system, which is in need of such improvements."

The Commission found that if PNM served Ranchers, then PNM's service would result in unnecessary duplication of electric facilities and economic waste.

The Commission found that although Ranchers preferred electric service from PNM, customer preference is not a controlling factor in determining public convenience and necessity. The Commission further found that the public convenience and necessity required that CD be allowed

to serve those loads, such as Ranchers, which develop in territory contiguous to its existing electrical distribution system, and that the Commission should issue its certificate to CD since all necessary elements were a part of the case record. The Commission found that although CD had not filed an application for a certificate, it would be granted one. The Commission then ordered that PNM should cease and desist from commencing or continuing with the proposal to provide service, denied PNM's petition for a certificate, and granted to CD a certificate that the public convenience and necessity required CD shall render electric service to Ranchers.

PNM sets forth six points as grounds for reversal. (I). That the Commission's order was unlawful and unreasonable to the extent the order found PNM's certificate had been annulled by Ch. 96, Laws 1967. (II). That where two utilities are contiguous to an unserved territory, New Mexico law permits either utility to serve the area and customer preference is controlling. (III). That the Commission unlawfully and unreasonably found that there was "unreasonable interference with the service and system of any other public utility" to exist. (IV). CD and PNM do not render the same type of service and the statutory prohibition against unreasonable interference does not apply. (V). That PNM's service to Ranchers would not result in unnecessary duplication of electric facilities and economic waste. (VI). That the Commission was without authority to issue to CD a certificate to serve Ranchers when CD had not applied for such a certificate. We feel point (I) is controlling in this appeal and thus direct our attention to its resolution.

Under their first point PNM contends that the Commission unreasonably and unlawfully disregarded the PNM certificates granted in cases Nos. 524 and 549. Further, PNM alleges that the basis for this disregard of the previous PNM certificates is the Commission finding that the PNM certificates were annulled in part by Ch. 96, Laws 1967. With respect to this con-

tention we look at the pertinent findings made by the Commission:

"5. The Commission Order in Case 524 granted PNM a certificate of public convenience and necessity in December, 1958 to acquire the 115 KV transmission line off of which PNM proposes to serve Ranchers. This certificate authorized service to Kermac-Nuclear Fuels Corporation and Phillips Petroleum Company via the 115/13.8 KV, 20,000 KVA substation near Ambrosia Lake in McKinley County, New Mexico.

"6. The Commission Order in Case 549 granted PNM a certificate of public convenience and necessity in December, 1959 to construct a 115 KV transmission line from the Ambrosia Lake substation to the Town of Gallup and to construct substation at Gallup, Smith Lake and Church Rock to extend service to Gallup, Phillips Petroleum Company, Lance Corporation and 'to other prospective customers who may be economically served from the above described facilities and from [PNM's] existing facilities in McKinley County, New Mexico and to render the said service to the said customers.'

" * * *.

"9. Chapter 96 of the Laws of 1967 annuls in part the Commission Order in Case 549 which permits PNM to serve all loads which are economically feasible from existing facilities in McKinley County. CD became a public utility by legislative fiat and thus is entitled to the protection of § 68–7–1 NMSA, 1953 which prohibits PNM form extending service into territory receiving service from CD without a certificate that the public convenience and necessity so require."

If Ch. 96, Laws 1967, which amended in part § 68–7–1, supra, and § 68–7–1.1, N.M. S.A., 1953 (Repl. Vol. 10, Pt. 1, 1973 Pocket Supp.), annulled in part PNM's existing certificate, a reading of the amended stat-

ute should provide the answer. The pertinent parts of that legislative enactment read as follows:

"68–7–1. New construction.—No public utility shall hereafter begin the construction or operation of any public utility plant or system or of any extension thereof, without first obtaining from the commission a certificate that public convenience and necessity require or will require such construction or operation; Provided that this section shall not be construed to require any such public utility to secure a certificate for an extension within any municipality or district within which it has heretofore lawfully commenced operations, or for an extension within or to territory already served by it, necessary in the ordinary course of its business, or for an extension into territory contiguous to that already occupied by it and not receiving similar service from another utility; Provided, however, that notwithstanding any other provision of the Public Utility Act, as amended, or any privilege granted thereunder, if any public utility in constructing or extending its line, plant or system unreasonably interferes or is about unreasonably to interfere with the service or system of any other public utility rendering the same type of service, the commission on complaint of the public utility claiming to be injuriously affected, may, upon and pursuant to the applicable procedure provided in sections 68–8–1 through 68–8–16 New Mexico Statutes Annotated, 1953 Compilation, and after giving due regard to public convenience and necessity, including but not limited to, reasonable service agreements between the utilities, make such order and prescribe such terms and conditions in harmony with this act as are just and reasonable so as to provide for the construction, development and extension, without unnecessary duplication and economic waste.

"68–7–1.1. Applications by utilities brought under the Public Utility Act.—

A. Within sixty [60] days after the effective date of this 1967 act, each utility brought within the jurisdiction of the public service commission by virtue of this 1967 act shall file with the commission an application, in such form as may be prescribed by the commission, for a certificate of public convenience and necessity covering its present plant, lines and system. Upon proof of the existence and operation thereof upon the effective date of this 1967 act, the commission shall grant to the utility such certificate.

"B. In the event the certificate granted a utility under subsection A of this section overlaps or conflicts with a valid certificate heretofore issued by the commission and exercised within the time required under section 68–7–2 New Mexico Statutes Annotated, 1953 Compilation, both certificates shall be valid and both utilities shall be permitted to continue service subject to the other provisions of the Public Utility Act, as amended."

We can see nothing in these sections from which it can be concluded that PNM's existing certificate was annulled.

Prior to the 1967 amendment, we held in New Mexico Elec. Serv. Co. v. Lea County Elec. Coop., 76 N.M. 434, 415 P.2d 556 (1966), that a certificate of public convenience and necessity could not be declared null and void where there was no finding by the Commission, based upon substantial evidence, that the certificate holder failed to exercise its right with diligence. We said (76 N.M. at 442–443, 415 P.2d 561–562):

"The record discloses that the Commission made no determination of whether Service Company, after commencing construction within one year after its certificate was granted, thereafter prosecuted the same with diligence. A finding based on substantial evidence that it had not done so was an absolute requirement before there could be a de-

termination that its certificate was null and void. Compare State ex rel. Petroleum Transp. Co. v. Washington Public Service Commission, 35 Wash.2d 858, 216 P.2d 177. Until we are presented with the question we do not determine what is or is not diligence in any given situation. Neither could the Commission deny to Service Company its right to continue in the area covered by its certificate *if its certificate had been exercised as required by § 68–7–2, supra,* or, in other words, if its certificate was valid in the area sought to be served by it, even though other public utilities had overlapping or conflicting certificates. § 68–7–1.1(B), N.M.S.A., 1953..

" * * *.

"As we read § 68–7–1, supra, its only possible application under the facts here present would arise from the language which states that, 'if any public utility in constructing or extending its line, plant, or system unreasonably interferes or is about unreasonably to interfere with the service or system of any other public utility, the commission on complaint of the public utility claiming to be injuriously affected may, after hearing, on reasonable notice, make such order and prescribe such terms and conditions in harmony with this act as are just and reasonable.' Assuming the applicability of the quoted language, and Service Company seems to proceed on the theory that it is applicable, it is nevertheless apparent that thereunder the Commission could not hold existing franchise rights null and void, nor could it make an order which would conflict with § 68–7–1.1, supra, which states that when certificates granted utilities under that section overlap, certificates theretofore issued 'and exercised within the time required under section 68–7–2, New Mexico Statutes Annotated, 1953 Compilation, both utilities shall be permitted to continue service.' Both of these things it undertook to do and, as held by the trial court, erred

therein. What kind of an order could legally be made, or what kind of terms and conditions could legally be imposed under § 68–7–1, supra, we do not consider. It is sufficient for our purposes that the order made was erroneous because the Commission mistakenly considered that Service Company's franchise was automatically null and void as to any part of the area not served within one year."

In concluding we said (76 N.M. at 444, 415 P.2d at 562):

"If the Commission has power to revoke a certificate, and for the purposes of this case we assume that it does, it would be our view that the authority as well as the procedure therefor would be found in §§ 68–8–1 to 68–8–16, inc., N.M.S.A. 1953, rather than in §§ 68–7–1 and 68–7–2, supra, as contended by the Commission. Neither the complaint in the instant case, nor the procedure followed, was sufficient to accomplish a cancellation of any authority held by any of the utilities here involved.

"We assume,, but do not decide, that a conclusion that the certificate of Service Company was null and void, if based upon proper findings, could probably be made in determining the issues in a hearing under § 68–7–1, supra, as a necessary incident of the larger questions presented thereunder, but even so, it would have to be based on ultimate findings of fact having substantial support in the evidence. Compare Templeton v. Pecos Valley Artesian Conservancy District, 65 N.M. 59, 332 P.2d 465."

As we view the matter, §§ 68–7–1 and 68–7–1.1, supra, as amended by Ch. 96, Laws 1967, did not change the law with respect to the issue herein involved. The legislature did not annul existing certificates, rather, in § 68–7–1.1(B), supra, it expressly provided for their continued validity. If an overlap occurs, then either utility can serve if there is need for such service.

We believe that the decision in New Mexico Elec. Serv. Co. v. Lea County Elec. Coop., supra, still controls in spite of the subsequent amendments to § 68–7–1, supra. The finding by the Commission, that the amended statute § 68–7–1, supra, annulled the certificate of PNM, is erroneous because it did not give full force and effect to all the provisions of the statute, in view of all its other findings entered in the case. It made a finding that the Ranchers' load was contiguous to both PNM and CD, and that Ranchers was not receiving any service from any utility. For a definition of the terms "contiguous" and "not receiving similar service from another utility," see Williams Electric Coop. v. Montana-Dakota Util. Co., 79 N.W.2d 508 (N.D.1956). Our pertinent statute in express terms provides that a utility may extend "into territory contiguous to that already occupied by it and not receiving similar service from another utility." The Commission, therefore, erroneously found that PNM and CD had to obtain certificates in order to serve. This finding requiring a certificate, coupled with the finding that PNM's certificate was annulled by legislation, requires a reversal of the Commission's order as being unlawful, unreasonable and beyond the scope of the Commission's authority. In view of our conclusion, as set forth herein, we do not deem it necessary to consider the other points advanced by PNM.

Our statute, § 68–9–5, N.M.S.A., 1953 (Repl. Vol. 10, Pt. 1, 1961), limits our disposition to either affirming or reversing the lower court. Therefore, in view of the foregoing this cause is remanded to the district court with instructions to set aside its order affirming the order of the Commission and remanding the same to the Commission for entry of an appropriate order in accordance with the views herein expressed.

It is so ordered.

OMAN and MARTINEZ, JJ., concur.